UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
MICHELE PASSARELLA,

                        Plaintiff,

     - against –

ASTORIA FEDERAL MORTGAGE CORP., LISA ORTIZ,
MAUREEN RUSSO, ANTHONY FIGUEROA,
GARY ZIMBOLATTI, CAROL ANN SOLFERINO,
KAREN DISUNNO and LISA KATLIAR,

                      Defendants.
----------------------------------------------------------------------X

Case No.

**COMPLAINT**

JURY TRIAL DEMANDED

## PRELIMINARY STATEMENT

1. The plaintiff herein, Michele Passarella, is a young woman who was employed by the
defendant, ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION.  Early on in
her period of employment with said defendant, plaintiff received the shocking and
devastating news that she had breast cancer.  Plaintiff wanted nothing more than to
carry on in the normal activities of her daily life while combating this deadly disease.
Plaintiff did her best to schedule all her appointments and treatments during non-
work hours and to miss minimal time from work.  She succeeded in this endeavor and
did not exceed her allotted personal and sick time.  She also continued to perform all
of the duties of her job – that is, all of the duties defendants would permit her to
perform.  As set forth in greater detail below, defendants engaged in a course of
conduct aimed at harassing plaintiff, subjecting her to disparate treatment, and plainly
making her work life so miserable that she would either go out on leave or resign.
Plaintiff was blatantly targeted due to her perceived disability.  Plaintiff stood strong
and complained about the discriminatory conduct of her co-workers, supervisors, and

human resources representatives (all named as individual defendants herein), all while plaintiff was undergoing surgery, radiation, and chemotherapy to combat the cancer.  Sadly, the defendants' conduct only worsened.  When plaintiff would not succumb to the pressure to take unpaid leave or resign her employment, defendants terminated plaintiff and then attempted to deny her unemployment benefits.  Plaintiff brings this action to redress the wrongs committed against her.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 in that claims asserted herein arise under the laws of the United States; this Court has jurisdiction over plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

4. Plaintiff MICHELE PASSARELLA (hereinafter "plaintiff") is a young woman, a former employee of defendant ASTORIA BANK, and a resident of the County of Nassau, State of New York.

5. Defendant ASTORIA FEDERAL MORTGAGE CORP. (d/b/a as ASTORIA FEDERAL SAVINGS & LOAN ASSOCIATION and hereinafter referred to as ASTORIA BANK) is a corporation duly organized pursuant to the laws of the State of New York and an "employer" as defined by all relevant statutes herein.

6. Defendant LISA ORTIZ is or was at all relevant times herein an employee of ASTORIA BANK and a resident of the State of New York.  Said defendant was plaintiff's co-worker during plaintiff's period of employment with ASTORIA BANK.

2

7. Defendant MAUREEN RUSSO is or was at all relevant times herein an employee of ASTORIA BANK, and a resident of the State of New York.  Defendant RUSSO was plaintiff's immediate supervisor in the context of her employment.

8. Defendant ANTHONY FIGUEROA is or was at all relevant times herein an employee of ASTORIA BANK, and a resident of the State of New York.  Said defendant worked in some managerial capacity over plaintiff in the context of her employment.

9. Defendant GARY ZIMBOLATTI is or was at all relevant times herein an employee of ASTORIA BANK, and a resident of the State of New York.  Said defendant held himself out as the employer's EEOC representative.  Said defendant carried out the termination of plaintiff's employment by ASTORIA BANK and, upon information and belief, was instrumental in the fabrication of pretexts and possible pretexts to mask the true discriminatory basis for plaintiff's firing.

10. Defendant CAROL ANN SOLFERINO is or was at all relevant times herein an employee of ASTORIA BANK, and a resident of the State of New York.  Said defendant was a manager of the Compliance Department, which was the department in which plaintiff worked.

11. Defendant KAREN DiSUNNO is or was at all relevant times herein an employee of ASTORIA BANK, and a resident of the State of New York.  Said defendant was the first representative of the Department of Human Resources of ASTORIA BANK to receive and fail to address plaintiff's complaints of discrimination.

12. Defendant LISA KATLIAR is or was at all relevant times herein an employee of ASTORIA BANK, and a resident of the State of New York.  Said defendant was a representative of the Department of Human Resources of ASTORIA BANK who refused

to address plaintiff's complaints of discrimination.  Said defendant also played a leading role in the conspiracy to develop the pretextual reason for plaintiff's termination to mask the true discriminatory intent and motive.

## FACTS

13. Plaintiff was hired on January 27, 2014 by defendant ASTORIA BANK as a Multi-Family Commercial Quality Control Analyst.  Her duties included processing multi-family and commercial mortgage loans from closing to delivery to the loan servicing system, and ensuring that all loans were in compliance with company policies and related laws and regulations.

14. Plaintiff's starting salary was $24.36 per hour, with a higher rate for overtime.  She typically earned $1,826.92 bi-weekly.  She also had medical benefits as part of her compensation package beginning April 1, 2014, and earned 3 sick days two months after her initial hire date, and an additional 2 sick days plus 5 personal days one year after her initial hire date.  Plaintiff was also entitled to vacation time.

15. The manager to whom plaintiff directly reported was defendant MAUREEN RUSSO.  Defendant RUSSO's supervisor was defendant ANTHONY FIGUEROA.  There was another compliance manager, defendant CAROL ANN SOLFERINO.

16. Plaintiff's only immediate co-worker initially was defendant LISA ORTIZ.  Defendant ORTIZ provided on-the-job training to plaintiff.

17. On April 21, 2014, plaintiff had a routine, annual physical.  A lump was discovered in her breast, and a mammogram was scheduled for May 6, 2014.

18. Upon her return to work immediately after the exam, plaintiff informed defendant ORTIZ of the awful news she had received.

19. Plaintiff also informed defendant RUSSO of her mammogram appointment because it would require plaintiff to leave work early.  The appointment was made for 3:30 p.m. as there were no evening or weekend hours available and time was of the essence.

20. April 20, 2014 marked the expiration of plaintiff's probationary period of employment.  Defendant RUSSO performed the evaluation, and plaintiff received a positive evaluation.

21. On May 6, 2014, plaintiff had the mammogram as scheduled.

22. On May 7, 2014, plaintiff was contacted by her doctor at work and informed that further testing was required.  A biopsy was scheduled for the following Saturday, May 10, 2014.

23. Defendants RUSSO and ORTIZ, who worked in very close proximity with plaintiff, became aware of the news conveyed to plaintiff by her doctor.

24. Plaintiff proceeded with the biopsy as scheduled.

25. On May 13, 2014 at 10:30 a.m., plaintiff was notified of the biopsy results while at work.  Plaintiff was informed that she had breast cancer.  Plaintiff became very distraught upon hearing this news, and defendants RUSSO and ORTIZ were aware, as was another co-worker that had recently been hired by ASTORIA BANK, Madeline Santana.

26. Soon thereafter, plaintiff noticed that defendant ORTIZ began micro-managing plaintiff's work and monitoring plaintiff's comings and goings from her desk. Defendant ORTIZ repeatedly and constantly asked plaintiff how she was coping, and plaintiff unsuspectingly confided in defendant ORTIZ her feelings of fear, sadness, etc.

27. Plaintiff would later learn that defendant ORTIZ was reporting to defendant RUSSO on plaintiff's responses to her questions.  Moreover, defendant would distort and overdramatize plaintiff's representations.  Upon information and belief, defendant ORTIZ reported to defendant RUSSO that plaintiff was "having a meltdown".

28. Defendant RUSSO followed plaintiff into the bathroom on several occasions during the period of time that the aforedescribed conversations and reports were taking place.

29. During this period of time (late May, early June), plaintiff was consulting with oncologists and getting various opinions as to treatment options.  These appointments occurred during evening hours and did not cause plaintiff to miss time from work. Defendants RUSSO and ORTIZ would ask plaintiff on a regular basis what her "next steps" were going to be.  Each time, plaintiff responded that she was evaluating her options and had not made a decision.  Defendants RUSSO and ORTIZ continued to ask the same question with increased frequency, almost daily in fact.

30. On June 10, 2014, defendant ORTIZ asked plaintiff to join her to get breakfast from the office cafeteria.  There, defendant ORTIZ asked plaintiff a barrage of questions about my diagnosis, treatment plan, doctor's appointments, etc.  Plaintiff felt that the questions were intrusive, but responded politely with generic information.  Plaintiff informed defendant ORTIZ during that conversation that she would need surgery and possibly chemotherapy

31. Upon returning to the office from the cafeteria, plaintiff observed defendant ORTIZ immediately go into defendant RUSSO's office and shut the door.

32. After approximately 20 minutes, defendants RUSSO and ORTIZ emerged from defendant RUSSO's office.  Defendant RUSSO then approached plaintiff and in a very aggressive manner insisted that plaintiff accompany her to defendant FIGUEROA's office immediately.

33. Plaintiff complied and followed defendant RUSSO into the office of defendant FIGUEROA.  Defendant FIGUEROA reprimanded plaintiff.  Defendant FIGUEROA said to plaintiff (in sum and substance) that he and defendant RUSSO had been informed by defendant ORTIZ that plaintiff had cancer.  Defendant FIGUEROA was angry that plaintiff had not herself informed management (i.e., defendants RUSSO and FIGUEROA) of her diagnosis, and demanded that plaintiff confirm or deny the report from defendant ORTIZ.  Plaintiff confirmed that she had cancer.

34. Defendant FIGUEROA continued to reprimand plaintiff.  Defendant FIGUEROA stated to plaintiff in sum and substance that plaintiff should have informed defendants FIGUEROA and RUSSO (as representatives of defendant ASTORIA BANK) of her diagnosis directly as soon as she became aware, and that defendants were concerned that the department's productivity may suffer if plaintiff becomes "preoccupied" with her cancer diagnosis and treatment.

35. Plaintiff was made to feel badly about not disclosing her illness, and apologized if she had violated some sort of protocol.  Plaintiff informed defendants FIGUEROA and RUSSO that she had not yet decided on her course of treatment, so she did not have additional information to provide them with at that time.

36. Defendants RUSSO and FIGUEROA continued to be closely monitor plaintiff's work using their agent, defendant ORTIZ as an informant.

37. Plaintiff began to feel as though she was being targeted at work.

38. On July 8, 2014, plaintiff received an e-mail from defendant FIGUEROA's administrative assistant advising that there would be certain half days in the summer and providing the half-day schedule.

39. Based on the modified summer schedule, plaintiff decided to proceed with chemotherapy because she could use those half-days to receive the chemo treatments while conserving her allotted personal, sick, and vacation days for any time off she may require.

40. On July 21, 2014, plaintiff went for a procedure at 7:30 a.m. at Sloane Kettering in Commack.  Plaintiff took half a day off from work and reported to work in the afternoon.  Plaintiff provided a doctor's note to defendant RUSSO.

41. Plaintiff began chemotherapy thereafter, including two treatments that week.  One of the two treatments plaintiff did on a scheduled half day.  The second treatment that week required plaintiff to miss some time from work, which she made up by working through a couple of lunch hours.

42. On July 31, 2014 at approximately 9:30 a.m., defendant ORTIZ approached plaintiff while she was working and removed a file from plaintiff's desk.  Defendant ORTIZ proceeded to hold the file up and state in a loud voice (for other people to hear), "People need to leave on time today.  You take too long on these files."  Defendant ORTIZ than left plaintiff's work area and took the file with her.  This caused plaintiff to feel very embarrassed.

43. Throughout the day, plaintiff's other co-workers approached plaintiff and remarked how rude defendant ORTIZ's actions were.  The co-workers also reassured plaintiff that defendant ORTIZ's statements were untrue and unfair.

44. Two hours later after accosting plaintiff, defendant ORTIZ returned the file to plaintiff without having done any work on it.

45. Defendant ORTIZ engaged in similar conduct towards plaintiff on multiple occasions.

46. Plaintiff grew weary of the different manner in which she was being treated at work by the defendants.  So, on August 2, 2014, plaintiff sent an email to the human resources department of ASTORIA BANK.

47. Plaintiff received a return e-mail directing her to contact defendant DISUNNO.

48. On August 6, 2014, plaintiff went for another procedure at Sloan Kettering.  Plaintiff had an early morning appointment and arrived at work late.  Plaintiff provided defendant RUSSO with a doctor's note.

49. On August 8, 2014, plaintiff had another chemo treatment in the early morning. When plaintiff arrived at work, she provided defendant RUSSO with a doctor's note.

50. Plaintiff made up almost all of the time she missed from work.  The balance of the time was deducted from time (sick and personal) she was entitled to take from work.

51. Plaintiff began losing her hair in clumps.  Plaintiff would go into the bathroom during work and use a lint roller on her clothing to remove any visible hair.

52. Around this same time, in mid-August, defendants began handing filed to plaintiff for her to work on.  Previously and for all other employees, the procedure was for

plaintiff to pick up files to work on from the Commitment Department.  Plaintiff felt this was another example of her being singled out.

53. On Monday, August 25, 2014, after losing a tremendous amount of hair over the preceding weekend, plaintiff came into work with a different hairstyle.  Plaintiff decided to cut her hair very short to mask the hair loss.  Plaintiff received a few odd looks at work, but the worst by far was from defendant ORTIZ.  Defendant ORTIZ looked at plaintiff as though she was grotesque.  Defendant ORTIZ stated to plaintiff in sum and substance, "you should have prepared me" and "you need to wear a wig".  Plaintiff was very upset at these remarks and tone in which they were made, and reported the actions of defendant ORTIZ to defendant RUSSO.

54. Defendant RUSSO subsequently informed plaintiff that she spoke with defendant ORTIZ about her conduct.  The implication was that defendant RUSSO corrected her.

55. Defendant ORTIZ continued to take files from plaintiff and return them later without having worked on them.  This slowed plaintiff's work productivity.

56. Defendant ORTIZ continued to berate plaintiff publicly and tell her that she takes too long on the files, which was not accurate.

57. Whenever plaintiff approached defendant ORTIZ with a work-related question, defendant ORTIZ became visibly annoyed and refused to answer plaintiff's question(s).

58. Plaintiff again complaint to defendant RUSSO about defendant ORTIZ's conduct.  In response to plaintiff's complaint, defendant RUSSO told plaintiff (in sum and substance), "You just have to deal with her.  That's the way she is."  Defendant RUSSO took no action towards defendant ORTIZ or to protect plaintiff.

59. On September 4, 2014, plaintiff emailed defendant RUSSO and requested a meeting to discuss the growing hostility being directed at her by defendant ORTIZ in the workplace.  Defendant RUSSO ignored plaintiff's e-mail on that occasion, and similarly ignored several subsequent requests to discuss the situation.

60. On September 8, 2014, plaintiff was walking past defendant FIGUEROA's office and he called plaintiff inside.  Defendant FIGUEROA asked plaintiff how things were going, so plaintiff proceeded to tell defendant FIGUEROA how poorly she was being treated by defendant ORTIZ.  Plaintiff further informed defendant FIGUEROA that defendant RUSSO was ignoring the issue.  To that, defendant FIGUEROA respondent (in sum and substance), "You have a disease and should not take it personally if work is taken away from you."

61. It became evident to plaintiff that she was receiving disparate treatment at work due to her cancer diagnosis.

62. On September 10, 2014, defendant RUSSO approached plaintiff and spoke to her loudly in a manner that was out-of-character for her and unlike any of their prior interactions.  Defendant RUSSO told plaintiff in front of co-workers that she was inputting certain information into the computer incorrectly.  Plaintiff reminded defendant RUSSO that there was a glitch in the computer program and a month prior plaintiff had been instructed (by defendants RUSSO and ORTIZ) to input the information in the manner she was doing it.  Plaintiff's co-worker, Ms. Santana, spoke up and corroborated what plaintiff had said, so defendant RUSSO dropped the issue.

63. Upon information and belief, defendants were trying to set up plaintiff to make it appear as though she was deficient in the performance of her job duties.

64. On September 17, 2014, defendant ORTIZ asked plaintiff to see her activity log. When plaintiff showed it to her, defendant ORTIZ directed her to change some entries. This was not something that plaintiff had ever been directed to do in the course of executing the duties of her job.

65. Slowly, plaintiff's job duties began changing at the hands of defendants RUSSO and ORTIZ. Responsibilities were being taken from plaintiff and given to Ms. Santana, who was hired after plaintiff.

66. Plaintiff sent an e-mail to defendant RUSSO inquiring about the reason for the changes, but defendant RUSSO again did not respond to plaintiff's email.

67. Plaintiff asked defendant RUSSO not to treat her differently just because she has cancer, and pointed out that she had not missed any significant amount of time from work that she did not make up and that her work was not suffering or declining.

68. Around this time, Ms. Santana passed a note to plaintiff stating (in sum and substance) that she believed the two (plaintiff and her co-worker, Ms. Santana) were being watched and listened to. In the note, Ms. Santana suggested that the two communicate by passing notes another rather than speaking aloud.

69. Defendant ORTIZ interfere with plaintiff completing her work in the most efficient manner by harassing her, removing files from her desk, and refusing to respond to plaintiff's work-related questions.

70. There came a time after the summer when plaintiff was advised by defendant RUSSO that she could no longer take half-days off and that if she had to miss work time for a

chemo therapy treatment, she must take a full-day off.  So, in October, plaintiff took a couple of days off for that purpose, as instructed.

71. Due in part to the extreme emotional distress plaintiff was experiencing at work (and in part to the stress and other feelings caused by her illness), plaintiff began to see a psychiatrist at the end of October.  Plaintiff's psychiatrist advised plaintiff to make a complaint to the Human Resources Department about the discrimination and hostility plaintiff was being subjected to at work.  Plaintiff followed her advice.

72. On November 4, 2015, defendant RUSSO called plaintiff into her office and proceeded to reprimand her.  Defendant RUSSO told plaintiff (in sum and substance), "You do not know how to do your job."  Defendant RUSSO told plaintiff that she was missing documents from closing attorneys and referenced particular files.  However, the files defendant RUSSO was complaining about had been completed by Ms. Santana, not plaintiff.  Plaintiff was confused by the whole encounter because she knew defendant RUSSO's allegations were untrue, and believed that defendant RUSSO also knew that her accusations were false.

73. Immediately upon leaving defendant RUSSO's office, plaintiff observed defendant ORTIZ go into defendant RUSSO's office and shut the door behind her.

74. After this, plaintiff's communication to defendant DiSUNNO of the Human Resources Department ("HR") of defendant ASTORIA BANK was returned.  Plaintiff told said defendant HR representative about everything that had been happening in her Department. Defendant DiSUNNO told plaintiff that defendant ORTIZ would be made to attend sensitivity training, and that she would speak with all parties involved.  Defendant DiSUNNO also promised plaintiff that her normal

work flow would resume after her surgery, and asked plaintiff if she wanted to move departments.  Plaintiff told defendant DiSUNNO that she did not want to move and have to learn an entirely different job when she was not the one causing the problem in the Department.

75. Defendant DiSUNNO also provided plaintiff with and strongly recommended that she sign an FMLA (Family Medical Leave Act) form.  Plaintiff did not anticipate needing time off from work beyond her regular allocated sick and personal days, so she declined to sign the form.

76. Although the promises of defendant DiSUNNO sounded good, upon information and belief, they were never followed through on.  The incidents of hostility against plaintiff at work continued and were unaffected by whatever actions defendant DiSUNNO may have taken, if any.

77. In mid-November, plaintiff made another complaint to defendant RUSSO regarding defendant ORTIZ's maltreatment of her.  Plaintiff also reached out to defendant DiSUNNO again.  Defendant RUSSO took no action on this complaint, and defendant DiSUNNO told plaintiff that she should speak to CAROL ANN SOLFERINO (the second manager in plaintiff's Department, who was not plaintiff's direct supervisor).

78. Plaintiff had surgery at the beginning of December.  She had 8 vacation days and 2 sick days at that time.  Defendant ASTORIA BANK sent another FMLA package to plaintiff's house, but plaintiff still felt she did not need additional time.

79. Besides not needing to exercise her right to FMLA and not wanting to take unpaid leave, it was important to plaintiff to still work and live as normally as possible.  She

did not want to be confined to home, but rather wanted to maintain as much normalcy in her life as possible.

80. Plaintiff returned to work and began receiving radiation during her lunch hour (for about a month after the surgery).  After that, plaintiff resumed chemotherapy. Plaintiff continued to ably carry out the functions of her job.

81. Plaintiff was informed at the end of January 2015 that defendant DISUNNO was no longer working in the same capacity in the HR Department, and that her contact person would be LISA KATLIAR from that point forward.

82. Plaintiff met with defendant KATLIAR, but plaintiff felt that KATLIAR was entirely disinterested in what plaintiff was telling her.  In fact, defendant KATLIAR was playing with her phone throughout their meeting.

83. Plaintiff also mentioned to defendant KATLIAR that it was time for her annual review, but the review had not been provided to her.  Plaintiff asked KATLIAR if she knew the reason for the delay. Defendant KATLIAR told plaintiff that she would look into the matter and the get back to plaintiff.

84. Defendant KATLIAR said that she was unaware of defendant ORTIZ being directed (purportedly) to attend sensitivity training, or that plaintiff was supposed to be allowed to resume her normal work activities now that her surgery had been completed.

85. The following day, January 30, 2015, defendant ORTIZ sent plaintiff an e-mail directing her to make a correction on a file that she had not worked on and did not have access to.  Plaintiff found this to be very peculiar; it was the first time she had

received such an instruction or received an email from defendant ORTIZ with a work "correction".

86. Plaintiff sent an e-mail to both defendants RUSSO and SOLFERINO questioning the instruction she had received from defendant ORTIZ, but both e-mails went unanswered.

87. Oddly, the practice continued.  Defendants ORTIZ and RUSSO began routinely sending e-mails and/or handing notes to plaintiff regarding corrections that needed to be made to certain files.  It was as though defendants were trying to set plaintiff up for termination.

88. On February 3, 2015, plaintiff asked defendant RUSSO to give plaintiff her normal job duties back.  Plaintiff told defendant RUSSO that she felt underutilized. Defendant RUSSO yelled at plaintiff, telling her (in sum and substance) in front of other employees that she makes mistakes and her productivity is poor.  Plaintiff knew this was not true, and she was once again made to be humiliated in front of her co-workers.

89. Plaintiff's job duties were never restored.

90. On February 9, 2015, plaintiff met with two new/other Human Resources representatives, defendant GARY ZIMBOLATTI and Javier Evans.  Plaintiff repeated to them everything that had been happening to her at work and even provided them with a letter detailing the discrimination and hostile work environment she was enduring.  Defendant ZIMBOLATTI's only response was to once again try to strongly persuade plaintiff to sign the FMLA form.  Plaintiff again declined as she did not require any leave from work.

91. ZIMBOLATTI also again asked plaintiff if I wanted to switch departments. Feeling defeated, plaintiff said she would consider it and asked that he provide her with a list of available options. That list was never forthcoming.

92. During that meeting, plaintiff asked defendant ZIMBOLATTI why she had not received her annual review yet. ZIMBOLATTI told plaintiff that the reason it had not yet been provided to her was because the review was being "carefully worded". Defendant ZIMBOLATTI told plaintiff not to be concerned.

93. On February 18, 2015, plaintiff was finally given her annual review (which should have been provided in January). The review of plaintiff's job performance was positive, and she received a salary increase.

94. However, the disparate treatment and hostile work environment continued for the ensuing months. Plaintiff continued to make complaints, all of which continued to be ignored.

95. On April 3, 2015, defendants issued to plaintiff a memorandum of a verbal warning. Plaintiff refused to sign the document because the allegations contained therein concerning her job performance were false.

96. The hostility grew even worse. Defendant RUSSO began to throw files onto plaintiff's desk whenever she wanted to give her a file to work on.

97. Additionally, during this period of time defendant ORTIZ was holding files that plaintiff had signed out to work on, but which defendant ORTIZ had removed from her desk as described above. Other departments were seeking the files. Upon information and belief, this was another attempt by defendants to set plaintiff up for

termination in retaliation for her complaints of discrimination and/or out of some inexplicable fear or disturbance by her disease.

98. Defendant RUSSO belittled and degraded plaintiff and her work performance.

99. On April 16, 2015, defendants KATLIAR and SOLFERINO called plaintiff into the conference room and was questioned about the missing files.  Plaintiff retorted that the filed were being held by defendants ORTIZ and RUSSO.  Plaintiff informed them that said defendants were reviewing each file she worked on, but that she did not understand the purpose of this since they were not informing her of any corrections needed and these same files had previously been signed-off on by defendant RUSSO.

100.    Defendant KATLIAR then confronted plaintiff about a new "issue".  She asked plaintiff whey she was forwarding e-mails to her personal e-mail address.  Plaintiff was surprised at this, but responded that she was forwarding certain items to use as training references since the chemotherapy was affecting her memory.  Defendant KATLIAR instructed her not to do this.  Plaintiff asked if she could print them so that she could look at them when she was not at work, and defendant KATLIAR said this would be ok.  Defendant KATLIAR promised to address plaintiff's other concerns at a later date, but she never did.

101.    On April 17, 2015, plaintiff was called into the conference room by a representative of defendant ASTORIA BANK's Human Resources Department whom plaintiff was not acquainted with.  Also in the meeting were defendant SOLFERINO and another manager from a different department.  Plaintiff was told to surrender her badge and not to return to work on Monday.  Plaintiff was not given any explanation at that time as to whether she was being terminated or suspended, nor

was she told the basis for such punitive employment action.  Rather, she was instructed to contact defendant ZIMBOLATTI with any questions.

102.    Plaintiff began trying to reach defendant ZIMBOLATTI immediately.  However, she had to leave several messages until they finally connected by telephone on April 21, 2015.  Defendant ZIMBOLATTI was very short with Plaintiff and told her she had two options: either resign immediately or get terminated before the close of business that day.  Plaintiff refused to resign.  A letter of termination was mailed to plaintiff.  She was not paid beginning April 20, 2015.

103.    Plaintiff applied for unemployment benefits.  Defendants opposed her request, and on this basis the NYS Department of Labor withheld payment pending investigation.

104.    Defendant ASTORIA BANK falsely claimed that plaintiff violated a company policy regarding e-mail forwarding.  Defendant's claims were deemed untrue and plaintiff was ultimately granted unemployment benefits. None of the e-mails forwarded by plaintiff contained customer information, breached privacy rules, or violated company policy.

105.    Plaintiff believes she was terminated as a retaliatory measure in response to her complaints of disability discrimination and hostile work environment.

106.    Plaintiff filed a complaint with the NYS Division of Human Rights, and was issued a Right-to-Sue letter by the Equal Employment Opportunity Commission on February 26, 2016.

## AS AND FOR A FIRST CAUSE OF ACTION
**AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. §§12101, *ET SEQ*.,
FOR EMPLOYMENT DISCRIMINATION ON THE BASIS OF DISABILITY
(DISPARATE TREATMENT)**

107. Plaintiff repeats and re-alleges all of the allegations set forth above in paragraphs 1-106 with the same force and effect as though fully set forth herein.

108. Plaintiff is a qualified individual with a disability as defined by the statute.

109. Plaintiff was forced to endure disparate treatment at work by all defendants named herein due to her disability.

110. Because of this, plaintiff suffered extreme emotional distress and mental anguish.

## AS AND FOR A SECOND CAUSE OF ACTION
**AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. §§12101, *ET SEQ*.,
FOR EMPLOYMENT DISCRIMINATION ON THE BASIS OF DISABILITY
(DISABILITY HARASSMENT)**

111. Plaintiff repeats and re-alleges all of the allegations set forth above in paragraphs 1-106 with the same force and effect as though fully set forth herein.

112. Plaintiff is a qualified individual with a disability as defined by the statute.

113. Plaintiff was harassed and humiliated in her place of employment due to her disability.

114. This harassment was severe and pervasive, and created an abusive work environment such that it interfered with plaintiff's ability to do her job.

115. Because of this, plaintiff suffered extreme emotional distress and mental anguish.

## AS AND FOR A THIRD CAUSE OF ACTION
**AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. §§12101, *ET SEQ*.,
FOR EMPLOYMENT DISCRIMINATION ON THE BASIS OF DISABILITY
(RETALIATION)**

116. Plaintiff repeats and re-alleges all of the allegations set forth above in paragraphs 1-115 with the same force and effect as though fully set forth herein.

117. Plaintiff is a qualified individual with a disability as defined by the statute.

118. Plaintiff complained of the unlawful, discriminatory practices described hereinabove and was terminated in retaliation for engaging in that protected activity.

119. As a direct result of those complaints, defendant ASTORIA BANK and the individual defendants named herein conspired together to develop a pretextual basis to justify the termination of plaintiff's employment, and then terminated her without just cause.

120. As a result, plaintiff was damaged financially, emotionally, and physically.

## AS AND FOR A FOURTH CAUSE OF ACTION
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. §§2000E, *ET SEQ.,* FOR EMPLOYMENT DISCRIMINATION ON THE BASIS OF GENDER

121. Plaintiff repeats and re-alleges all of the allegations set forth above in paragraphs 1-106 with the same force and effect as though fully set forth herein.

122. Insofar as plaintiff was discriminated against in the context of her employment due to her breast cancer diagnosis, symptoms, treatments, and side effects, and breast cancer is a disease that almost exclusively (and certainly disproportionately) impacts women, plaintiff was discriminated against on the basis of her gender.

## AS AND FOR A FIFTH CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW §§290, *ET SEQ.,* FOR DISCRIMINATION ON THE BASIS OF DISABILITY AND GENDER

123.  Plaintiff repeats and re-alleges all of the allegations set forth above in paragraphs 1-122 with the same force and effect as though fully set forth herein.

124. Plaintiff qualifies as a person with a disability under the definition set forth in N.Y. Exec. Law §292(21).

125. Plaintiff is a woman.

126. Because of plaintiff's disability or perceived disability, which is a disability that women as a demographic are uniquely and disproportionately stricken with, plaintiff was subjected to discriminatory, disparate, and harassing treatment at work, and then retaliated against for complaining of such unlawful conduct.

127. As a result of the defendants' actions described hereinabove, plaintiff has been damaged.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

128. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 106 of this complaint with the same force and effect as though fully set forth herein.

129. The defendants, and each of them, acted outrageously in their above-stated roles in the harassment, discrimination, and set-up and termination of plaintiff.

130. The defendants' actions were patently unreasonable, malicious, and cruel, and they knew or should have known that their conduct would cause severe and extreme emotional harm to the plaintiff.

131. As a result of the defendants' conduct, plaintiff suffered and continues to suffer from episodes of depression, anxiety, anger, loss of sleep, and other such impairments of her emotional well-being, to the extent that the plaintiffs have had to seek professional support and counseling.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

a. On the First Cause of Action in the sum of One Million Dollars ($1,000,000.00)

b. On the Second Cause of Action in the sum of One Million Dollars ($1,000,000.00)

c. On the Third Cause of Action in the sum of One Million Dollars ($1,000,000.00).

d. On the Fourth Cause of Action in the sum of One Million Dollars ($1,000,000.00)

e. On the Fifth Cause of Action in the sum of One Million Dollars ($1,000,000.00)

f. On the Sixth Cause of Action in the sum of One Million Dollars ($1,000,000.00)

g. Declaratory Judgment that defendants' willfully violated plaintiffs' rights secured by federal and state law as alleged herein;

h. Injunctive relief requiring defendants to correct all past violations of federal and state law as alleged herein, to enjoin defendants from continuing to violate federal and state law as alleged herein, and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and,

i. An order granting such other legal and equitable relief as the Court deems just and proper;

j. An award costs of this action including attorney's fees to the plaintiffs.

A jury trial is hereby demanded.

Dated: Locust Valley, New York
      May 26, 2016

Respectfully Submitted,

KRISTINA S. HEUSER, P.C.

By:          /S/         
Kristina S. Heuser, Esq. (KH3612)
Attorney for Plaintiff
Post Office Box 672
Locust Valley, New York 11560
Tel. (516) 676-1565
